1        **UNITED STATES DISTRICT COURT**

2              **DISTRICT OF OREGON**

3              **PORTLAND DIVISION**

4   JAMES E. PATRICK,                    )
                                         )
5                    Plaintiff,          )      No. 03:11-cv-06427-HU
                                         )
6   vs.                                  )
                                         )
7   MICHAEL J. ASTRUE,                   )  **FINDINGS AND RECOMMENDATION**
    Commissioner of Social Security,     )
8                                        )
                     Defendant.          )
9                    _____

10

11  Kathryn Tassinari
    Mark A. Manning
12  Harder, Wells, Baron & Manning, P.C.
    474 Willamette, Suite 200
13  Eugene, OR 97401

14        Attorneys for Plaintiff

15

16  S. Amanda Marshall
    United States Attorney
17  Adrian L. Brown
    Assistant United States Attorney
18  1000 S.W. Third Avenue, Suite 600
    Portland, OR 97204-2904
19

20  David Morado
    Regional Chief Counsel, Region X, Seattle
21  Terrye Erin Shea
    Special Assistant United States Attorney
22  Office of the General Counsel
    701 Fifth Avenue, Suite #2900 M/S 221A
23  Seattle, WA  98104

24  Mary F. Lin
    Special Assistant United States Attorney
25  Social Security Administration
    Office of the General Counsel
26  1301 Young Street, Suite A702
    Dallas, TX 75202-5433
27

28        Attorneys for Defendant

1 - FINDINGS & RECOMMENDATION

HUBEL, United States Magistrate Judge:

The plaintiff James E. Patrick seeks judicial review pursuant to 42 U.S.C. § 405(g) of the Commissioner's final decision denying his application for Disability Insurance ("DI") benefits under Title II of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, and Supplemental Security Income ("SSI") under Title XVI of the Act. Patrick argues the Administrative Law Judge ("ALJ") erred in failing to give adequate weight to the opinions of Patrick's treating physician and an examining psychologist; and in failing to include all of Patrick's limitations in hypothetical questions to the Vocational Expert, and in the ALJ's own residual functional capacity assessment. *See* Dkt. ## 14 & 17.

### *I. PROCEDURAL BACKGROUND*

Patrick filed his applications for DI and SSI benefits on December 5, 2008, at age 36, claiming a disability onset date of May 23, 2008. (A.R. 26, 161-62[1]) At that time, Douglas claimed he was disabled due to severe pain and "lock[ing] up" of his knees. (A.R. 185) On reconsideration, Patrick also claimed disability due to bipolar disorder. (*See* A.R. 115) His applications were denied initially and on reconsideration. (A.R. 97-115) Patrick requested a hearing, and a hearing was held before an ALJ on July 8, 2010.

---

[1]The administrative record was filed electronically using the court's CM/ECF system. Dkt. #11 and attachments. Pages of the record contain three separate page numbers: two located at the top of the page, consisting of the CM/ECF number (e.g., Dkt. #11-6, Page 2 of 22); a Page ID#; and a page number located at the lower right corner of the page, representing the numbering inserted by the Agency. Citations herein to "A.R." refer to the agency numbering in the lower right corner of each page.

(A.R. 43-96)  Patrick was represented by an attorney at the hearing, and he testified on his own behalf.  A Vocational Expert ("VE") also testified at the hearing.  On July 28, 2010, the ALJ issued his decision, finding that although Patrick has severe impairments consisting of "status post multiple arthroscopic surgeries of the left knee; depression; and borderline intellectual functioning" (A.R. 28), his impairments do not meet the Listing level of severity, and he retains the capacity to perform his past relevant work as a small package courier.  Alternatively, if Patrick's past work as a courier does not qualify as past relevant work, then the ALJ found Patrick could perform other work existing in significant numbers in the national economy, such as box filler, laboratory equipment cleaner, and bench worker. (A.R. 37)  The ALJ therefore concluded Patrick was not disabled at any time through the date of his decision. (A.R. 26-38)

Patrick requested review, and submitted additional evidence that was considered by the Appeals Council. (*See* A.R. 5)  On November 10, 2011, the Appeals Council denied Patrick's request for review (A.R. 1-4), making the ALJ's decision the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

Patrick filed a timely Complaint in this court, requesting judicial review.  Dkt. #2.  The matter is fully briefed, and the undersigned submits the following Findings and Recommendation for disposition of the case pursuant to 28 U.S.C. § 636(b)(1)(B).

/ / /

/ / /

/ / /

/ / /

3 - FINDINGS & RECOMMENDATION

## II.  FACTUAL BACKGROUND

### A.  Summary of the Relevant Medical Evidence

On March 5, 2000, Patrick was seen in the emergency room for pain in his left knee arising from an injury at work the previous evening.  Patrick gave the following history of his injury:

> He was transferring wood from one spot to another spot, and planted his left foot, and in the process of turning around, twisted his left knee.  He heard a loud pop.  The knee gave out on him and he collapsed to the ground.  He describes a twisting, torque-like mechanism of injury.  He was able to bear weight initially for a couple of hours after this happened.  At one time, he had to go up a large ladder, and he had lots of pain and difficulty with this.  He noted subsequent swelling.  This morning when he tried to get out of bed, he couldn't, and he noted significant swelling, marked pain and discomfort.  He now [states] it is too painful to bear weight.

(A.R. 281)  An x-ray of Patrick's knee was negative.  He was diagnosed with an "[a]cute left knee injury, internal derangement, suspect anterior cruciate ligament injury." (A.R. 281-82) Vicodin and ibuprofen were prescribed for pain.  Patrick was directed to "use a knee immobilizer when up, and . . . o.k. to do some easy range of motion while at rest.  Limited weight bearing as tolerated, and . . . use crutches as needed." (A.R. 282) He was advised to follow up with an orthopedic specialist in three to five days.  (*Id.*)

In early May 2000, a doctor at Orthopedic Healthcare Northwest diagnosed Patrick with patellar subluxation, arising from his March 2000 injury.  The doctor prescribed four to six physical therapy visits for Patrick, but Patrick only used two of the visits, and his goals were not met due to "poor attendance." (A.R. 362, 362-64)

4 - FINDINGS & RECOMMENDATION

1    On July 17, 2000, Patrick saw orthopedic surgeon Douglas K.
2  Lundsgaard, M.D. for "reevaluation on the left knee" due to ongoing
3  pain in the knee.  (A.R. 228; *see* A.R. 227-39)  Dr. Lundsgaard
4  noted an MRI of Patrick's knee suggested a possible medial meniscus
5  tear.  The doctor planned to "request authorization for an arthro-
6  scopic procedure."  *Id.*

7    Patrick was admitted to the hospital on August 4, 2000, for an
8  arthroscopic  procedure  on  his  left  knee.  (*See* A.R. 358-61)
9  Dr. Lundsgaard performed "debridement of [the] suprapatellar plica,
10  patellar shaving for poasttraumatic chondromalacia[2], [and] lateral
11  retinacular release." (A.R. 360)  During the procedure, the doctor
12  observed good release on visualization and palpation, and noted
13  Patrick's patella was tracking somewhat better.  (*Id.*)

14    On December 29, 2001, Patrick was helping a roommate carry a
15  coffee table up some stairs when he suffered a "twisting-type
16  injury" to his right knee.  (A.R. 278)  Patrick heard a popping
17  sound, and his knee "gave out on him."  (*Id.*)  He had marked
18  limitation of flexion of the right knee, but no fracture or
19  dislocation.  (A.R. 278-80)  He was diagnosed with an acute right
20  knee ligamentous injury.  Vicodin was prescribed, as well as an Ace
21  bandage and knee immobilizer.  Patrick was told he could "do easy
22  range of motion as tolerated at rest but . . . [to] use the knee
23  immobilizer when he [was] up and bearing weight." (A.R. 279)
24  / / /

25

26

27    [2]Patellar chondromalacia, often called "Runner's Knee," is a
   softening and breaking down of the cartilage under the kneecap. *See*
28  http://www.nlm.nih.gov/medlineplus/ency/article/000452.htm (visited
   Feb. 14, 2013).

5 - FINDINGS & RECOMMENDATION

1    Patrick was involved in an on-the-job auto accident on
2  March 5, 2003, when he was rear-ended at moderate speed. (A.R.
3  276) Patrick was seen in the emergency room for complaints of
4  increasing neck stiffness after the accident.  He was diagnosed
5  with a "classic whiplash injury and cervical strain." (*Id.*)  A
6  one-day course of Vicodin was prescribed, and a longer dose of
7  Motrin 800 mg. (*Id.*)

8    On May 13, 2003, Patrick suffered an acute back injury at
9  work.  He stated he was "carrying a bundle of copper, [and] when he
10 was setting it down, he felt something pull in his back[.] [He now
11 is] complaining of 8/10 back pain with occasional shooting pains
12 down his left leg." (A.R. 347)  He was diagnosed with "Acute low
13 back strain with left lower extremities radiculopathy." (*Id.*)  He
14 was placed on modified work for one week, with the following
15 limitations: "Sitting job primarily but he is able to ambulate, no
16 lifting, pushing, pulling over 10 lbs.   Minimize twisting and
17 bending.   Change positions frequently, no kneeling, squatting,
18 crawling." (*Id.*)  Patrick was directed to follow up with Occupa-
19 tional Medicine on May 20, 2003, at which time the doctor expected
20 Patrick's symptoms to have resolved. (*Id.*)  Notes indicate Patrick
21 had been seen in April 2003, for an ankle sprain he suffered on the
22 job, but that injury had resolved completely and was unrelated to
23 his current injury. (*Id.; see* A.R. 348-54)

24    In January 2004, Patrick experienced some dizzy spells, and
25 went to the emergency room for evaluation.  He was diagnosed with
26 vertigo.   Antivert was prescribed, and he was directed to follow up
27 with his primary care physician. (A.R. 273-75)

28

6 - FINDINGS & RECOMMENDATION

1    On July 16, 2004, Patrick suffered a low back strain at work
2  while handling a five-foot-long, eighty- to ninety-pound board.
3  Doctors prescribed Vicodin, Flexeril, and Naproxen, and Patrick was
4  kept off work until July 20, 2004.  (A.R. 340-42)

5    Patrick was seen in the emergency room on May 29, 2005, with
6  a complaint of left wrist pain, increasing over the past three
7  days.  He was diagnosed with left ulnar tendonitis.  A short course
8  of Vicodin was prescribed, as well as a metal forearm splint, and
9  ibuprofen 600 mg.  (A.R. 332-35)

10    On January 12, 2006, Patrick was working at a job "slinging
11  veneer," when a six-inch piece of wood became embedded in his
12  medial right upper arm.  He went to the emergency room, where the
13  foreign body was removed with a 1 cm. laceration, and sutured.
14  (A.R. 112-31)  He was seen in the emergency room for follow-up and
15  suture removal on January 19, 2006, and was deemed "medically
16  stationary," with "[n]o permanent impairment.  (A.R. 323-24)

17    On May 20, 2007, Patrick was seen in the emergency room with
18  a complaint of back pain at "9/10 intensity."  (A.R. 320)  Patrick
19  reported straining his back at work two days earlier, when he "was
20  lifting three crates of bread and felt something kind of twinge in
21  his back."  (*Id.*)  He initially thought the pain was improving, but
22  it had persisted, causing him "quite a bit of subsequent pain and
23  spasm, tight discomfort, difficulty moving and ambulating."  (A.R.
24  267)  He was started on Tylox, Valium, and Motrin, and was released
25  to return to work with one week's restrictions of no lifting,
26  pushing, or pulling over five pounds; minimize twisting or bending;
27  change positions frequently; and no driving or operating heavy
28  equipment.  (A.R. 322)

7 - FINDINGS & RECOMMENDATION

1    The next day, May 21, 2007, Patrick was seen in the emergency
2    room after fainting at work. (A.R. 267-70) He had taken his
3    medications as prescribed the day before for his back injury, and
4    then drove himself and his wife to work (they worked at the same
5    place). He was placed on light duty and assigned to a desk job
6    when he arrived at work. Patrick had "some episodes of feeling
7    sweaty" during the day, and did not feel well all day. At one
8    point, he went outdoors with his wife to smoke a cigarette. "He
9    began to feel more and more lightheaded," and intended to go back
10   inside to lie down, when "he simply collapsed," and his wife was
11   unable to hold him up. (*Id.*) Patrick's wife stated "it took
12   approximately 10 minutes before he was once again answering
13   questions appropriately." (*Id.*) An EKG was normal. He had a
14   mildly-elevated white blood cell count, but other lab work was
15   unremarkable. He was diagnosed with "an episode of vasovagal
16   syncope" (i.e., fainting). He was advised not to take Tylox or
17   Valium before driving or going to work, and he was encouraged to
18   drink plenty of clear liquids. He was released to return to his
19   current light duty position. (A.R. 268)

20   Patrick was taken to the emergency room on October 3, 2008, by
21   police, for evaluation of suicidal ideation. (A.R. 263-66)
22   Patrick reported longstanding problems getting along with his wife,
23   with a recent exacerbation involving an argument at a hospital in
24   San Francisco, where Patrick's stepdaughter was being treated for
25   liver failure. Patrick became very frustrated, and wrote a suicide
26   note on October 2, 2008, which alarmed his mother, causing her to
27   call the police. Patrick denied further suicidal thoughts or
28   plans, and stated he had never attempted to harm himself and

8 - FINDINGS & RECOMMENDATION

doubted he ever would.   "He just felt like he needed to write down on paper his frustrations and it put them in the form of a suicide note. . . . [He] felt like he just had to get some stuff off his chest."  (A.R. 263)   Patrick was evaluated by "the crisis mental health staff," who felt that although Patrick had "some ongoing depression related to frustrations with his social situation," he was not at risk to harm himself or others.   (A.R. 264)   He was diagnosed with adjustment disorder with depressed mood.  (A.R. 266) He was discharged home with a recommendation for follow-up counseling.  (A.R. 264, 266)

Patrick saw orthopedic surgeon Rudolf G. Hoellrich, M.D. on October 6, 2008, for evaluation of left knee pain.  (A.R. 237-39) Patrick was noted to be 5'7" tall, with a weight of 203 pounds, and no remarkable past medical history.  (A.R. 237, 238)   The doctor noted the following history of Patrick's current complaint:

> Patrick is a 36-year-old man who works on a fish processing ship.  He was injured on 4-23-2008 when carrying a basket of fish and he stepped out [of] an egg house on board and lost his footing, slipped, twisted, and felt a pop in his left knee.  He has seen 2 different providers in the State of Washington and has had an MRI scan obtained which showed a complex tear of the posterior horn medial meniscus in the left knee.  He reports he is unable to kneel and squat without pain. Twisting produces medial knee pain.  He has had intermittent swelling and popping.  He has not been able to return to his previous work.

(A.R. 237)   In addition, Patrick reported "some emotional distur-bances and skin itching."  (*Id.*)

Dr. Hoellrich noted that when Dr. Lundsgaard performed arthroscopy of Patrick's left knee in August 2000, the menisci of Patrick's left knee "looked normal."  (*Id.*)   After examining

9 - FINDINGS & RECOMMENDATION

Patrick, Dr. Hoellrich's assessment was "Traumatic medial meniscal tear, left knee, secondary to on-the-job injury." (A.R. 238)  The doctor noted Patrick's symptoms were consistent with abnormalities seen on an MRI study from June 25, 2008.  (*See* A.R. 240, MRI report)  Patrick was "not currently medically stationary and . . . not cleared to return to his regular work until this problem is treated," but he was "capable of sedentary work." (A.R. 239)

Patrick saw Dr. Hoellrich on October 29, 2008, for a pre-operative evaluation.  He received a prescription for Vicodin for post-operative pain, and he was given a work release from the date of surgery (scheduled for November 3, 2008) until his first post-operative visit, seven to ten days later.  (A.R. 236)

On November 3, 2008, Patrick underwent an arthroscopic proce-dure on his left knee for "partial medial meniscectomy," and "patellar chondroplasty.[3]"  (A.R. 233; *see* A.R. 233-35).  His pre-operative diagnosis had been only a medial meniscal tear of the left knee.  However, during the procedure, the doctor also found patellar chondromalacia[4], resulting in the patellar chondroplasty. Patrick tolerated the procedure well, and was scheduled for follow-up in one week.  (*Id.*)

On November 10, 2008, Patrick saw Dr. Hoellrich for follow-up of his medial meniscectomy, which was noted to be "related to [an] on-the-job injury," and a chondroplasty for pre-existing patellar

---

[3]Chondroplasty is a procedure to repair or remove damaged car-tilage under the kneecap.  *See* http://www.nlm.nih.gov/medlineplus/ency/article/000452.htm (visited Feb. 14, 2013); Stedmans 77390 (Stedman's Med. Dict. 27th ed., available on Westlaw).

[4]*See* note 2, *supra*.

10 - FINDINGS & RECOMMENDATION

1   chondromalacia. (A.R. 232) Patrick complained of moderate aching
2   in the knee, which he rated at "2 or 3 / 10." (*Id.*) He had
3   started weight-bearing as tolerated, and was scheduled to begin
4   therapy in a few days. The doctor indicated Patrick was "capable
5   of sedentary work only" at this time, and he was "not medically
6   stationary." (*Id.*) The doctor prescribed an Arthropad "to help
7   reduce postsurgical swelling about the knee." (*Id.*)

8   Patrick saw Dr. Hoellrich on December 9, 2008, for follow-up.
9   Patrick was undergoing physical therapy and was improving slowly.
10  He complained of "pain in the knee with squatting, kneeling and
11  deep knee bending activities." (A.R. 231) The doctor indicated
12  Patrick was "not medically stationary," and should be limited to
13  sedentary work at this time. The doctor prescribed Feldene (a
14  nonsteroidal anti-inflammatory drug) and a knee sleeve for pain and
15  inflammation. (*Id.*)

16  On January 15, 2009, Patrick saw Dr. Hoellrich for follow-up.
17  Patrick reported some continued pain in his knee, with "popping and
18  grinding with certain things like squatting and kneeling," and
19  sometimes "a pop in the front of the knee" when he got out of bed.
20  (A.R. 230) He had completed a course of physical therapy on
21  January 5, 2009, and stated the therapy was helpful. He was taking
22  Feldene for pain. The doctor noted some "lingering swelling," and
23  administered a cortisone injection. He also aspirated about 10 cc
24  of fluid from the knee. The doctor prescribed another four weeks
25  of once-weekly physical therapy. Although he noted Patrick was
26  still "not medically stationary," the doctor relaxed Patrick's work
27  restrictions to allow a 30-pound lifting limit, no squatting or
28  kneeling with his left knee, and the need to change positions as

11 - FINDINGS & RECOMMENDATION

needed for comfort. (*Id.*) Feldene was continued for pain, and Patrick was directed to do home exercises and use ice to control swelling and ease pain. (*Id.*)

On February 24, 2009, Mary Ann Westfall, M.D. reviewed Patrick's medical records and completed a Physical Residual Functional Capacity Assessment form. (A.R. 242-49) Dr. Westfall opined Patrick would be able to lift up to twenty pounds occasionally and ten pounds frequently; and stand/walk and sit for about six hours each in a normal workday, with the requirement that he be able to alternate sitting and standing as needed to relieve pain or discomfort. (A.R. 243) The doctor opined Patrick would be able to climb ramps or stairs, balance, and stoop frequently, and perform all other postural functions occasionally. (A.R. 244) She indicated Patrick should avoid concentrated exposure to vibration and hazards. (A.R. 246) She found Patrick to have no manipula-tive, visual, or communicative limitations. (A.R. 245-46) In arriving at her opinions, Dr. Westfall indicated she had "given substantial weight" to the work restrictions imposed on Patrick by Dr. Hoellrich, which Dr. Westfall indicated coincided "with all objective evidence." (A.R. 248)

On May 5, 2009, Patrick saw Steven W. Neubauer, M.D. in the emergency room with a complaint of knee pain. Patrick stated he had lifted his left leg to cross his legs, flexing at the left knee, "when he suddenly developed pain to the medial aspect of his left popliteal fossa area." (A.R. 261) Patrick stated the pain was "kind of throbbing," but he had no weakness, numbness, or tingling. Patrick stated that since his knee surgery the previous November, he had experienced "intermittent episodes of locking to

12 - FINDINGS & RECOMMENDATION

that knee." (*Id.*) Patrick was not taking any medications. On examination, Patrick held his knee slightly flexed. He complained of tenderness, but had no swelling, and no indications of a fracture, a meniscal tear, or a rupture or tear of the anterior or posterior cruciate ligament of the knee. (*Id.*) The doctor prescribed a knee immobilizer, a short course of Vicodin, and Motrin 800 mg for the pain. He advised Patrick to follow up with Dr. Hoellrich if his symptoms did not improve in ten to fourteen days. He also suggested contacting Dr. Hoellrich anyway with regard to the intermittent locking of Patrick's left knee. (A.R. 262)

Patrick was seen in the emergency room on June 3, 2009, with a complaint of left knee pain that had worsened gradually for several days. He was able to ambulate with moderate discomfort. His knee was somewhat swollen, but he had full range of motion on flexion and extension of the knee. He was diagnosed with a left knee sprain, and was directed to take ibuprofen, and use ice and elevation, to relieve his discomfort. The treating doctor spoke with Patrick "about the likelihood of him having an occult ligamentous injury or possibly a meniscus injury," and he advised Patrick to follow up with his primary care provider. (A.R. 319; *see* A.R. 314-19)

On August 16, 2009, Patrick underwent a psychodiagnostic evaluation and I.Q. testing administered by clinical psychologist Charlotte Higgins-Lee, Ph.D. (A.R. 292-99) Dr. Higgins-Lee conducted a clinical interview, and administered the Wechsler Adult Scale of Intelligence-III (WAIS-III) test. Patrick described a violent, unstable childhood. He was beaten regularly by his

13 - FINDINGS & RECOMMENDATION

father, and also witnessed his father beating his mother. Patrick was molested by a family friend when he was a toddler, resulting in the molester's imprisonment. According to Patrick, he did not walk until age two, did not talk very well until age three, and tends to stutter. He was in special education classes at school, where he often got into fights and threw things at his teachers. He dropped out of school halfway through the ninth grade. His father forced him to go to work, and took his paycheck, which Patrick stated his father used to buy alcohol. (A.R. 292)

Dr. Higgins-Lee noted Patrick "reported many symptoms of PTSD," stating he "is depressed all of the time, [and] is also anxious as well as angry." (A.R. 293) Patrick indicated he often frightens his wife, to whom he had been married for thirteen years. (*Id.*)

Patrick used alcohol and other drugs until about age 21 or 22, when "he just quit doing drugs." (*Id.*) He reported drinking a couple of beers every night, which he stated helps him "relax and forget his past." (*Id.*) Patrick and his wife were living in a travel trailer parked on a friend's property. Before that, they lived in their van. He stated he is unable to work due to his knee problems. His wife does not work, and they have no income. Patrick stated he does not like to be around people, and he has difficulty in situations where there is an authority figure present. "He absolutely cannot tolerate having a supervisor yell at him[.]" (*Id.*) He has been in fights at work, including altercations with supervisors and coworkers over work situations. Patrick stated "[h]is anger problem has also caused him to lose a lot of good friends. His wife's family does not want to have any

14 - FINDINGS & RECOMMENDATION

contact with him because he has such an anger problem." (A.R. 294)
He also reported difficulty remembering names and dates, and for-
getting what he is doing. (*Id.*)

Patrick gave a work history that includes delivery, fast food,
gas station work, and fishing in Alaska. He stopped working after
injuring his knee on a fishing boat in 2008. He is afraid to be
out in the dark alone, and claimed he had lost a delivery job for
that reason. (A.R. 293) Patrick stated that during his knee
surgery on November 3, 2008, "it was found he has chronic arthritis
in his knee and it is moving up to his hip." (*Id.*) Dr. Higgins-
Lee observed that Patrick walked with a limp, favoring his right
knee, and he held the handrail when descending stairs.

Patrick described his activities of daily living as follows:

> On a typical night he said he sleeps off and
> on. Sometimes it takes him several hours to
> fall asleep. He will sleep for an hour or so
> and then wake up. He is always up at least by
> 6 AM even if he has had only two or three
> hours of sleep. He has nightmares at least
> three or four times a week. His wife has told
> him he has kicked her when they have been
> asleep and also throws his arms around. The
> first thing he does every morning is look at
> his wife to see if she is all right. There
> are times when he has left a mark on her. She
> has told him he talks in an angry way in his
> sleep.
>
> He doesn't do much of anything during a day.
> He will go with [h]is wife to the grocery
> store but doesn't finish shopping with her.
> He mainly sits in the car while his wife shops
> because he doesn't like to be around people.
> There have been times when he removes himself
> from a function with his wife's family because
> he cannot tolerate yelling.
>
> He drives his car and is able to find various
> locations. He doesn't do any maintenance on
> his car and doesn't know how to do any
> maintenance on a house. He can manage money

15 - FINDINGS & RECOMMENDATION

> all right he said.  "I always pay my bills" he
> stated.
>
> He can fix meals but his wife usually does the
> cooking.    He  cooks  eggs  and  bacon  and
> hamburger helper.  He can do laundry but he
> doesn't.  "I have done laundry" he explained.
>
> He can do his own grooming but explained he
> hasn't bothered to shave for a while.    This
> was [illegible] but could not be described as
> a beard.

(A.R. 294-95)

On the WAIS-III test, Patrick obtained a Verbal I.Q. of 74; a Performance I.Q. of 74; and a Full-Scale I.Q. of 72.  Dr. Higgins-Lee noted that individuals with limited education, or who have been in special education classes, often achieve low scores on the Verbal Subtests such as Arithmetic, which measures "calculation skills and working memory," and Vocabulary and Information.  (A.R. 295)  His test results suggested he made a consistent, good effort on the tests.  (*Id.*)  His scores placed him "in the borderline range of intellectual functioning."  (A.R. 296)  Dr. Higgins-Lee opined that because Patrick has been able to work in jobs requiring average intelligence, his scores may have been somewhat lower than expected due to his poor education.  However, she further noted that Patrick's Verbal I.Q. could suggest some mild mental retardation.  (*Id.*)

Dr. Higgins-Lee opined Patrick's reported history of frequent altercations suggests he might have difficulties with coworkers and supervisors.  She also noted that PTSD symptoms could cause him difficulties "since he is hypervigilent [sic] and has frequent flashbacks and times when he re-experiences abuse from his child-hood."  (*Id.*)

16 - FINDINGS & RECOMMENDATION

Patrick was seen in the emergency room on August 18, 2009, after "his knee suddenly 'locked out'" while he was working at the fair, operating a ride. (A.R. 463) He was unable to bend the knee without significant pain. Patrick indicated he had had several episodes of similar knee locking since he had knee surgery the previous fall. Patrick was treated with oral Percocet, and after about half an hour, the doctor "was able to manipulate his knee and able to bend it and clearly he had better range of motion at this point than he had earlier." (*Id.*) The doctor expressed concern that there could be "a loose body within the knee joint, perhaps a piece of cartilage or a joint mouse[5]." (A.R. 463-64) X-rays showed no evidence of fracture or "ossified loose bodies." (A.R. 467) He prescribed Vicodin and Ibuprofen 800 mg; directed Patrick to try to manipulate his knee gently, and to use crutches if needed; and directed him to follow up with Dr. Hoellrich. (A.R. 464)

On August 27, 2009, Patrick saw Physician's Assistant John M. Brandon at Oregon Medical Group, to establish as a new patient. Patrick described current problems including his ongoing knee pain, high blood pressure, depression, and tobacco abuse. Lab tests were ordered, and Patrick received samples of Symbyax for bipolar disorder and depression, and "[a] few Vicodin for his knee." (A.R. 384-85)

On September 1, 2009, Patrick saw Robb N. Larsen, M.D. at Orthopedics and Sports Medicine Clinic for a complaint of chronic

---

[5]A "joint mouse" is "a loose fragment (as of cartilage) within a synovial space." http://www.merriam-webster.com/medical/joint%20mouse (visited Feb. 22, 2013).

17 - FINDINGS & RECOMMENDATION

pain in his left knee.  Patrick had nearly full range of motion of his knee, but exhibited "tenderness along the medial greater than lateral joint lines." (A.R. 394)  His knee was mildly swollen, but no crepitation, popping, or clicking was observed.  The doctor opined Patrick's pain was "related to the chondromalacia." (A.R. 395)  The etiology of the episodes of locking was unclear. Dr. Larsen noted, "Due to an MRI often providing little beneficial information in the setting of knees that have had prior meniscec-tomies, I have recommended an arthroscopy to diagnose and ideally, treat the problem.  He may have a displaced meniscus tear or possibly a loose body." (*Id.*)  Surgery was scheduled for September 23, 2009.

Patrick saw P.A. Brandon again on September 11, 2009, to discuss smoking cessation and his lab results.  He was started on Lisinopril for hypertension, Chantix for smoking cessation, and Simvastatin for hyperlipidemia.  Patrick reported the Symbyax was "helping quite a bit," so it was continued.  In addition Patrick was encouraged to begin working toward a regular exercise program, with the understanding that he would not be able to start this with his lower extremity until after his upcoming knee surgery. (A.R. 379)

Patrick was admitted to the hospital on September 17, 2009, in preparation for a diagnostic arthroscopy of his left knee on September 23, 2009. (*See* A.R. 301-13)  Since his left knee surgery in October 2008, Patrick had noticed "only minimal improvement in symptoms." (A.R. 310)  He had undergone physical therapy, but continued to have pain.  He also complained of "multiple episodes of locking where he has actually had to go to the emergency room to

18 - FINDINGS & RECOMMENDATION

1   have his knee unlocked.[6]  He describes pain ranging from 7 to 9/10.

2   He uses a cane for ambulatory assistance."  (*Id.*)

3       Patrick's preoperative diagnoses were "Left knee pain with

4   mechanical symptoms," and "Rule out medial meniscus tear versus

5   loose body."  (A.R. 305)  During the procedure, the doctor found

6   degenerative changes in the medial meniscus, but he located "no

7   frank tear that could explain locking [and] [n]o loose bodies were

8   encountered."  (A.R. 306)  Abnormal-appearing, rust-colored syno-

9   vial tissue was removed and biopsied with "no evidence of acute

10  inflammation or malignancy."  (A.R. 304, 305)

11      Dr. Larsen saw Patrick on October 1, 2009, for postoperative

12  follow-up.  Patrick stated his knee had given out on him, but his

13  pain was somewhat improved.  The doctor noted Patrick's knee was

14  swollen significantly, and he had no explanation for this.   He

15  recommended Patrick "undergo routine knee rehab."  (A.R. 410)

16      On October 20, 2009, Patrick saw Dr. Larsen for follow-up.

17  Patrick continued "to have pain and swelling in the knee," with the

18  pain primarily in the front of the knee.  (A.R. 409)  The doctor

19  was unable to explain the ongoing pain and swelling in Patrick's

20  knee. He administered a steroid injection, and directed Patrick to

21  return in two weeks for further evaluation.  (*Id.*)

22      Patrick saw Dr. Larsen on November 3, 2009, for follow-up of

23  ongoing pain in his left knee.  The doctor indicated he was "not

24  sure what else can be done."  (A.R. 406)  He referred Patrick to

25  physical therapy, with repeat evaluation scheduled in six weeks.

26  (*Id.*)

27  ───────────────

28      [6]The Record contains records of only one ER visit for purposes
    of "unlocking" Patrick's knee.  (*See* A.R. 463)

    19 - FINDINGS & RECOMMENDATION

On December 15, 2009, Patrick saw P.A. Thomas J. Dernbach at Orthopedics and Sports Medicine, for follow-up of his ongoing left knee pain.  Patrick stated the pain was somewhat improved, although he continued to have pain and "popping."  (A.R. 405)  He also complained of some pain, popping, and clicking in his right knee. P.A. Dernbach noted some atrophy of Patrick's right quadriceps, and Patrick exhibited tenderness at the medial joint line of his right knee.  The P.A. noted the "mechanical symptoms and joint line pain" of Patrick's right knee were "suggestive of a meniscus."  (*Id.*) Patrick was referred to physical therapy.  (*Id.*)

Patrick saw P.A. Dernbach for follow-up on January 26, 2010. Patrick complained of "significant pain in his left knee" that was keeping him awake at night.  (A.R. 402)  The pain was throughout the knee, rather than localized, and Patrick stated the pain made it "difficult for him to ambulate."  (*Id.*)  Notes indicate Patrick had been scheduled for physical therapy, but the doctor's office had been unable to reach him.  Patrick also complained of ongoing right knee pain and clicking.  On examination, he had normal range of motion in both knees.  He described stiffness in his left knee, and exhibited "tenderness both medially and laterally on the joint line."  (*Id.*)  P.A. Dernbach noted "palpable crepitus," although Patrick had no patellar tenderness.  On the right knee, Patrick was "tender both medially and laterally on the joint line," and also "at the insertion of his lateral hamstrings."  (*Id.*)  P.A. Dernbach opined Patrick's ongoing left knee pain "may be related to peripatellar arthritis and also synovitis."  (*Id.*)  He administered a steroid injection to Patrick's left knee, and again ordered physical therapy.    Regarding Patrick's right knee pain,

20 - FINDINGS & RECOMMENDATION

P.A. Dernbach noted the etiology was unclear.  He ordered an MRI of Patrick's right knee. (*Id.*)

On February 4, 2010, Patrick saw P.A. Dernbach with complaints of pain in both knees.  His left knee pain had improved somewhat with the corticosteroid injection, but now the pain was returning. He was scheduled for physical therapy beginning February 8, 2010. Regarding his right knee, the pain was worse with activity, but he still had pain at rest.  Patrick also described some "clicking" in the knee.  (A.R. 386, 400)  On examination, Patrick's right knee was tender "over the anterior and medial joint line," with "some peripatellar crepitus and tenderness."  (*Id.*)  No clicking was noted.    An MRI of his right knee showed "a perimeniscal cyst anteriorly and strong suspicion for an anterior horn meniscus tear," as well as "some at least grade 2 change in the posterior horn of the medial meniscus."  (*Id.*)  P.A. Dernbach offered physical therapy for Patrick's right knee, but Patrick declined, opting instead to see Dr. Larsen at the clinic to "discuss whether arthroscopy would be appropriate."  (*Id.*)  Patrick was cautioned that even with surgery, "his global type non-activity related pain may not resolve."  (*Id.; see* A.R. 387, 401)

Patrick saw Dr. Larsen on February 8, 2010, to review a recent MRI of his right knee.  Patrick indicated he had had pain in his right knee for a couple of months, "localized to the medial joint line," as well as "some popping and clicking." (A.R. 398)  Patrick had near-full range of motion of his right knee.  He exhibited "tenderness along the medial joint line."  (*Id.*)  The MRI was "essentially normal," with no "abnormalities on it that would

21 - FINDINGS & RECOMMENDATION

explain his current symptoms." (*Id.*)  The doctor advised Patrick to use Tylenol as needed for pain.  (*Id.*)

Patrick's saw P.A. Brandon on March 12, 2010, concerned about his "skin being yellow." (A.R. 378)  P.A. Brandon saw no signs of jaundice.  He encouraged Patrick to decrease his caloric intake and increase his activity.  (A.R. 378)

On May 3, 2010, Patrick saw Dr. Larsen for follow-up.  Patrick reported that his left knee had improved somewhat, but he continued to have pain in his right knee.  The doctor noted Patrick has "a loculated cyst in the anteriolateral knee," and he administered a steroid injection which improved, but did not eliminate, Patrick's pain.  (A.R. 397)

On May 18, 2010, Patrick saw Family Medicine specialist Steven M. Yoder, M.D. for follow-up of hypertension, hyper-lipidemia, bipolar disorder, and knee pain.   The doctor ordered Patrick's records from his previous doctor, directing Patrick to continue taking Lisinopril for hypertension until receipt of the records.   Regarding bipolar disorder, Patrick had been taking Symbyax, which he stated was not helping him at all.   Patrick stated he felt "depressed, irritable, anxious, [had] difficulty sleeping, low self-esteem, and loss of interest in activities." (A.R. 427)  He reported some suicidal thoughts in the past, but none currently.   In addition, Patrick stated he had "learning disabilities and [was] trying to get on SSI." (*Id.*)  Dr. Yoder noted Patrick's affect was "a little flat," but the doctor noted no other objective findings.  He increased Patrick's Symbyax dosage to 5 mg daily, and increased his Prozac dosage to 40 mg daily.  (*Id.*) Regarding Patrick's knee pain, the doctor noted crepitus in the

22 - FINDINGS & RECOMMENDATION

left knee with no swelling. He diagnosed Patrick with osteoarthritis of the left knee, and prescribed Naprosyn 500 twice daily, and Vicodin. (A.R. 428)

Patrick saw Dr. Larsen for follow-up on May 27, 2010. Patrick reported ongoing pain in his right knee. The doctor noted, "I think I have very little else to offer at this point. I have recommended weight loss as well as continued therapy for stretching and strengthening. [Patrick] understands and will return to clinic as needed." (A.R. 396)

On June 3, 2010, Patrick saw Dr. Yoder for follow-up of chest pain, bipolar disorder, and knee pain. Regarding Patrick's chest pain, the doctor noted Patrick's hypertension was "not at goal." (A.R. 424) He opined Patrick's chest pain was due to acid reflux, and he started Patrick on daily Pepcid. He also added metoprolol for blood pressure control. Regarding Patrick's bipolar disorder, Patrick indicated he was "feeling much better since going to Prozac 40 mg and continuing olanzapine 5 mg daily. His depression has decreased." (*Id.*) Regarding Patrick's ongoing knee pain, Patrick stated Naprosyn had "helped only slightly." (*Id.*) He had developed some pain in his lower back, radiating from his thighs, and the Naproxen did not help this pain. Patrick's range of flexion was limited, and he complained of increased pain with extension, and low back pain with straight leg raising. The doctor diagnosed osteoarthritis of Patrick's knee. Patrick stated the Vicodin was making him nauseous, so the doctor prescribed diclofenac 75 mg. (a nonsteroidal antiinflammatory medication) twice daily. (A.R. 425)

On June 8, 2010, Dr. Yoder completed a medical evaluation form regarding Patrick. He noted Patrick's diagnoses as mild high blood

pressure, obesity, high cholesterol, reflux esophagitis, PTSD, and osteoarthritis of the knee. He noted Patrick "states he has bipolar disorder." (A.R. 429) Dr. Yoder opined that all of Patrick's medical conditions could be expected to last a year or more. (*Id.*) He opined Patrick's medical conditions would not require him to lie down or rest periodically during the day, although he might "need to sit periodically." (A.R. 430) He opined the side effects from Patrick's medications "should not limit his activities." (*Id.*) He indicated Patrick would need to elevate his legs "only if it helps decrease pain." (*Id.*

Dr. Yoder opined Patrick would be able to stand and walk for less than two hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and he should never lift over 50 pounds. (A.R. 430-31) He offered no opinion regarding Patrick's ability to maintain a regular work schedule, noting he would have to send Patrick for a formal evaluation to offer an opinion. The doctor further noted, "[Patrick] told me the main problem he has with work is his learning disability. I have no records of testing for this." (A.R. 431)

On June 19, 2010, Patrick underwent a CT scan of his abdomen and pelvis. The study showed sigmoid diverticulosis with some indications of early diverticulitis. (A.R. 461) Patrick apparently was started on Cipro and Flagyl at this time. (*See* A.R. 452) On June 27, 2010, Patrick was seen in the emergency room with a complaint of abdominal pain that had worsened despite seven days of oral antibiotics. The pain was located mostly in his left lower quadrant. Patrick also was experiencing nausea, vomiting, and diarrhea. A repeat CT of Patrick's pelvis was done, and compared

24 - FINDINGS & RECOMMENDATION

to the June 19, 2010, CT scan.   This time, the study showed "progressive changes in the colon and sigmoid, descending, trans-verse, and possibly ascending colon . . . [with] no evidence of diverticulosis present[, and] [f]indings . . . most consistent with colitis, possibly ulcerative colitis." (A.R. 455)  Because of his vomiting and nausea, Patrick was hospitalized and placed on IV antibiotics.   He also was given some IV morphine for pain control, and he was placed on a liquid diet.   (A.R. 455)   Patrick was discharged from the hospital on June 29, 2010, "feeling great." (A.R. 450)  His discharge diagnosis of his abdomen was "Colitis, most likely infectious but cannot totally exclude inflammatory bowel disease." (A.R. 451)

On July 26, 2010, Patrick was seen in the emergency room after injuring his right shoulder.   Patrick stated he had been "playing with kids in the pool yesterday and tossing them and he sustained an injury to the right shoulder." (A.R. 444)  He reported pain on the front of his right shoulder, radiating around to the back near his scapula, "worse with any motion." (*Id.*)   Examination was "quite limited because of pain at this time." (*Id.*)   The doctor diagnosed a shoulder strain.   He prescribed a short course of Percocet for pain, and advised Patrick to do range-of-motion exercises "to avoid frozen shoulder." (A.R. 445)

On August 5, 2010, Patrick was seen in the emergency room with a complaint of left-sided abdominal pain associated with nausea. (A.R. 441-43)  He was treated with IV fluids and pain medication, which helped relieve his symptoms.   Doctors recommended a colonoscopy "to determine whether he has colitis and if so what [it] might be caused by." (A.R. 443)  A colonoscopy was scheduled

25 - FINDINGS & RECOMMENDATION

1  for the next morning.  Patrick was offered hospitalization, but he
2  preferred to go home, and he was discharged with prescriptions for
3  Percocet and Phenergan for pain and nausea.  (*Id.*)

4  On February 7, 2011, Patrick saw Peter W. Ganter, M.D. to
5  establish care as a new patient.  Patrick had requested a new
6  primary care physician "because he felt that Dr. Yoder was not
7  doing much for his right shoulder, which has given him pain and
8  restrictions for more than 3 months."  (A.R. 486)  Patrick
9  complained of "occasional pain going up his neck from the right
10 shoulder."  (*Id.*)  A shoulder x-ray was ordered.  Notes indicate
11 physical therapy was "unfortunately not available."  (A.R. 487)

12 On February 16, 2011, Patrick saw Dr. Ganter for follow-up of
13 his right shoulder pain.  His pain persisted despite a subacromial
14 injection.  An x-ray of his right shoulder showed "[m]ild resorp-
15 tive changes of the distal clavicle [i.e., "some softening of
16 collar bone"; A.R. 485) which could be consistent with a mild
17 degree of posttraumatic osteolysis."  (A.R. 484)  An MRI was
18 ordered.  (A.R. 483)

19 On February 21, 2011, Patrick underwent an MRI of his right
20 upper extremity to evaluate his complaints of severe pain and
21 restriction of his right shoulder.  Findings were "consistent with
22 edema and osteolysis of the distal clavicle," with "inflammatory
23 response within and around the AC joint," and "[n]o AC separation."
24 (A.R. 481)  Rotator cuff muscles were intact.  (A.R. 482)

25 Patrick saw Dr. Ganter on February 28, 2011, for follow-up of
26 "Metabolic syndrome/musculoskeletal pain/possible SAS." (A.R. 478)
27 An MRI of Patrick's shoulder had "confirmed some osteolysis in the
28 distal clavicle." (A.R. 478)  He was referred to a "Dr. Fletcher"

26 – FINDINGS & RECOMMENDATION

for treatment of his shoulder.  Patrick's primary complaints were "profound fatigue, lack of energy, [and] easy fatigability." (*Id.*)  His score on the Fatigue Severity Scale (FSS) was "consistent with chronic fatigue syndrome." (*Id.*)  The doctor noted the FSS is a nine-symptom checklist on which Patrick's score was "12 total with typical symptoms of depression being present up to half of the time." (*Id.*)  Patrick also reported "several days of suicidal thoughts," although he indicated "he would never act on it." (*Id.*)  Diagnoses included metabolic syndrome, for which Patrick was advised to being an exercise program, and "increase his fish oil from 1 capsule to 3 capsules daily"; vertigo, single episode; shoulder pain, with follow-up scheduled with Dr. Fletcher; chronic fatigue, with suspected sleep apnea, for which a nocturnal oximetry test was ordered; hypertension, in "better control" on current medications; and depression, stable with Prozac and Zyprexa, "but the 9-symptom checklist is still positive for symptoms of untreated depression." (A.R. 478-79)  Dr. Ganter indicated a psychiatric consult might be in order, and he might switch Patrick to Effexor at his next visit.  (A.R. 479)

On March 9, 2011, Patrick again was seen in the emergency room with abdominal pain.  He stated he was driving when the pain began, and as he was driving to the hospital, "he became lightheaded so he pulled over to the side of the road and called the medics to bring him the rest of the way in." (A.R. 434)  The pain was identical to the pain he had in the past when he was diagnosed with diverticulitis.  Notes indicate a colonoscopy had confirmed this diagnosis.  Patrick was treated with IV fluids, pain medication, anti-nausea medication, and antibiotics.  His white count was

27 - FINDINGS & RECOMMENDATION

elevated.  Patrick "refuse[d] any imaging studies." (*Id.*)  He was discharged home with "very strict return precautions and instructions to follow up with his [primary care provider] either tomorrow or the next day for reassessment." (*Id.*)

On March 11, 2011, Patrick saw Dr. Ganter for follow-up of his ER visit.  Notes indicate Patrick recently had received a steroid injection into his AC joint and into the subacromial space, for treatment of osteolysis.  The injection was "to be repeated every three months," and if the injections did not provide sufficient relief, then "surgical intervention" would be necessary.  (A.R. 476)  Patrick was taking hydrocodone 7.5 mg four to six times daily for pain.  He was continued on Flagyl and Cipro for his diverticulitis, and was advised to eat a bland, low-roughage diet.  Regarding Patrick's depression, notes indicate he was "doing well on Prozac and Zyprexa." (*Id.*)

Patrick saw Dr. Ganter on April 4, 2011, for follow-up of blood sugar fluctuations.  Patrick complained of a daily headache for the past three to four weeks, sometimes severe, coming on without warning, and sometimes associated with nausea.  The headache sometimes lasted all day.  The doctor noted Patrick's headaches were "suggestive of migraine, but not typical." (A.R. 474)  He was referred to a neurologist for further evaluation.  Notes indicate Patrick's shoulder pain and headaches were well managed with hydrocodone and Tylenol.  He was started on a trial of gabapentin for diabetic neuropathy symptoms, and the doctor indicated gabapentin also might "be a good migraine preventative medication." (A.R. 475)

28 - FINDINGS & RECOMMENDATION

### B.  Patrick's Testimony

#### 1.  Patrick's hearing testimony

Patrick was 37 years old at the time of the ALJ hearing.  He is 5'7½" tall, and at that time weighed about 250 pounds.  He and his wife recently had moved to a second-story apartment, and had to climb stairs to get to the apartment.  (A.R. 48)  He has an unrestricted driver's license, and stated he drives somewhere every couple of days, going to the grocery store, restaurants, family members' homes, and the like.  (A.R. 48-49)  Although he owns a car, he and his wife still take the bus on occasion, and they had arrived at the hearing by bus.  (A.R. 49)  They had just obtained the car about three weeks before the ALJ hearing.  Before then, they did not have a car.  (A.R. 77)

Patrick began smoking at about age 15, and smokes about half a pack of cigarettes a day.  He has no hobbies, and his only real activity is talking a walk occasionally with his wife.  (A.R. 50)  Patrick completed the ninth grade, leaving school because he "[c]ouldn't handle the work and couldn't understand a lot of things."  (Id.)  He does not have a GED, and has not had any vocational training since leaving high school.  (Id.)  Patrick's wife receives SSI; Patrick stated she is disabled due to depression "and something else."  (A.R. 51)  According to Patrick, his wife has been on disability since she was in her early teens.  (Id.)  Patrick and his wife also receive about $326 a month in food stamps.  (A.R. 52)  They have no income other than his wife's SSI and their food stamps.  (A.R. 53)

Patrick stated he injured his leg while working on a fishing boat in Alaska, in May 2008, and he has not worked since then.  At

29 - FINDINGS & RECOMMENDATION

the time of the ALJ hearing, he had settled a maritime claim against this employer, and he expected to end up with $18,000 to $19,000 from the settlement. (*Id.*; A.R. 64) After injuring his leg, he "tried to work for a while," but when he "got to where [he] couldn't walk or anything like that . . . they sent [him] home." (A.R. 64) Since then, he has "tried to find work like at gas stations, things like that, but ain't nobody hiring." (A.R. 54) He has not attempted to get any vocational training, stating, "I don't know how to do that." (A.R. 64) He stated he could work if he was able to "be on [his] leg long enough." (*Id.*) If he had a job with a sit/stand option, "like a ticket seller in a booth," he could probably do the job. (A.R. 65) He also thought he probably could do simple assembly line work, or work putting small items into boxes. (*Id.*)

When Patrick worked on the fishing boat, he was a "processor," working "down in the hole." (A.R. 54) The job entailed gutting fish and packing them in boxes for freezing. (A.R. 57) The job required him to work sixteen to eighteen hours a day, seven days a week. He did the same type of work in 2007, but earned a lot less money because it was a "[b]ad season," with "[n]o fish." (A.R. 56)

Before working on the fishing boats, Patrick spent several years at a number of short-term jobs. He worked at a particle board mill, where he drove a forklift and did cleanup work. (A.R. 58) He worked at a different mill for a very short time, but he "walked off" because he "didn't like the people that [he] worked with." (A.R. 59) He also did some jobs through a temporary service, but could not recall what jobs he did through the service. He worked as a driver for a courier service, delivering packages

30 - FINDINGS & RECOMMENDATION

around town. On that job, he was required to lift thirty- to forty-pound boxes, and he sometimes delivered ten boxes at a location. He used a hand truck to transport the boxes. (A.R. 59)  He also worked as a driver for National Foods, but quit because he did not like the job. (A.R. 60)  He was hired by Fun Enterprises to do carnival work at the Lane County Fair, but he quit the job almost immediately; he could not recall why. (*Id.*) He was a part-time merchandiser for Dreyer's Ice Cream, but could not recall why he left. (A.R. 60-61)  He drove a milk truck for a dairy, but got laid off from that job. The truck was a "small 14-foot boxtruck." (A.R. 61)  He used a hand truck on that job, as well, delivering milk and ice cream to schools and other locations. (A.R. 62)  The job often started "early in the morning," when it was still dark. (A.R. 75)  He worked as a driver for a plumbing supply company for a couple of years, but quit that job to go to work at the particle board mill.  At another job, he "helped make fire harnesses." (A.R. 63)  And "way back a long time ago," he worked as a dishwasher at an IHOP restaurant. (*Id.*)  None of his jobs as a driver ever required him to obtain a commercial driver's license (CDL), and although he has "taken the test for the permit," he has never obtained a CDL. (A.R. 82-83)

Patrick's short-term positions often ended because he would not "like the way [he] was being talked to or the way people were looking at [him] or [he] would think they were talking about [him]." (A.R. 79)  When he felt this way, he would "just walk off" the job, without telling anyone. (*Id.*)  Things that cause Patrick get angry quickly include the way people talk to him, and "when [he doesn't] understand a lot of different things of what [he is] being

asked." (A.R. 81)  He stated he does not handle stress very well.
When he feels stressed, he gets angry, and wants "to get up and
walk out" and "shake [his] leg." (*Id.*)

Patrick stated his physical condition that presents the
greatest problem for him with regard to work is "major arthritis in
[his] left leg." (A.R. 65-66)  He has had three surgeries on that
leg since 2000, and stated his leg "locks up on [him] at any given
time, [and he is] always in pain." (A.R. 65)  Patrick indicated
his understanding is that his knee locks up because he only has
"40% left of the cartilage[, and] [o]ther than that, it's pretty
much bone on bone." (A.R. 80)  When his knee locks up, he has to
"stand there and twist it around and rub it and everything else to
get it to unlock." (A.R. 79)  He sometimes uses a cane to help
himself walk, particularly when he and wife go for a walk, or when
they go to the grocery store.  According to Patrick, the cane was
prescribed by "Dr. Brandon."[7] (A.R. 80)

Patrick stated the pain in his knee is constant. (A.R. 67)
On a typical day, even taking Vicodin three to four times a day,
his pain is at 7 to 8 on a 10-point scale. (A.R. 66)  He stated he
has been taking Vicodin regularly since his surgery in September
2009.  He has no side effects from the medication. (*Id.*)  He also
takes an arthritis medication, but he could not remember which one.
Patrick stated the Vicodin helps his pain somewhat, and without it,
his pain would be "[a]t least a nine," close to the point of going
to the emergency room. (A.R. 67)  The ALJ observed that
Dr. Yoder's notes indicate Vicodin caused Patrick to throw up.

---

[7]John M. Brandon is actually a Physician's Assistant, not a
doctor. (*See* A.R. 385)

32 - FINDINGS & RECOMMENDATION

Patrick stated he had no knowledge of that, and he has no side effects from Vicodin. (A.R. 75)

Besides his left leg/knee, Patrick stated his temper also interferes with his ability to work. He stated he has "been diagnosed with bipolar" by a psychiatrist, and he "get[s] angry real fast." (A.R. 68) He takes a medication for bipolar disorder that was prescribed by Dr. Yoder, but he could not recall the name of the medication. He indicated the medication "helps somewhat" in dealing with his mood swings and anger. (A.R. 68-69) He also takes Prozac for depression. He stated the Prozac is helpful, and he does not experience any side effects from it. (A.R. 69) He also takes medications for high blood pressure, heartburn, and cholesterol, but none of those cause any side effects. (A.R. 72)

Patrick stated he also has problems with "learning." (A.R. 70) He does not read very well, and has problems reading and following complex instructions. He can read a menu, but requires assistance to fill out forms, such as the forms he filled out in connection with his application for disability benefits. He can do basic addition and subtraction, but cannot do algebra or calculate percentages. (A.R. 70-71) His wife takes care of their money. (A.R. 71)

Patrick stated he has problems reading a map and following directions. The ALJ noted Patrick had earned a good income as a driver, and questioned how Patrick was "able to get around to all these different places." Patrick responded, "Trial and error." (A.R. 72) He noted he has lived in the area for a long time, and "know[s] where a lot of different places are." (*Id.*) He was able

33 - FINDINGS & RECOMMENDATION

to read and pass the test to get a driver's license, but stated it "took [him] a few times." (*Id.*)

On a typical day, Patrick will "sit around the house, watch TV, take a nap," and sometimes take a walk for "[a] couple of blocks" with his wife. (A.R. 73) He helps his wife do dishes, and cooks dinner occasionally. He is able to take the trash out to the dumpster. He also is able to handle his own personal care needs. Patrick stated when he and his wife moved to their current apartment, they tried to get a place on the ground floor, but nothing was available. Patrick had a handicapped parking pass at one time, but when it expired, he did not renew it. (A.R. 73-74)

Patrick stated he used to have a drinking problem when he was younger, but he had not consumed any alcohol for "a long time. Years." (A.R. 76) He also used some street drugs when he was young, but he no longer uses any street drugs. (A.R. 76-77)

Patrick said physical therapy was somewhat helpful for his knee pain, but he could not attend all of his physical therapy appointments because he did not have transportation at the time. (A.R. 77) He and his wife try to go on walks to help his knee. (A.R. 77-78) He can only walk a few blocks at a time because of pain in his left leg. He also has "[s]light pain" in his right leg. (A.R. 78) In addition to taking pain medication for his leg, Patrick either sits with his leg propped up on an ottoman or lies down in bed a couple of times a day, for 30 to 35 minutes each time. (A.R. 78-79)

/ / /

/ / /

/ / /

34 - FINDINGS & RECOMMENDATION

## 2.    Patrick's written testimony

Patrick completed a Function Report - Adult on December 29, 2008. (A.R. 191-98) He described his daily activities as follows: "I wake up around 8:00 am, I have coffee and watch T.V., then if I can move around good enough I go out and take care of daily errands, then back home and watch TV, then around 9:00 pm I go to bed." (A.R. 191) He feeds his dog and takes her outside, but if he is unable to do these things, his wife cares for the dog. Before he began having knee problems, he was able to "get around better without pain and fear of falling." (A.R. 192) Severe pain in his knee wakes him up at night. He has problems getting in and out of the shower, but otherwise is able to care for his personal needs without assistance. (*Id.*) He prepares food daily, making sandwiches, and sometimes cooking full meals. He is able to do the dishes, and do house-cleaning and laundry, and he spends three to four hours weekly on these types of tasks. (A.R. 193) He tries to go outside daily. When he goes out, he usually drives a car. He shops for food once a month, for about two hours at a time, and he is able to pay bills, count change, handle a savings account, and use a checkbook and money orders. (A.R. 194) Patrick's only leisure activities are watching television, talking on the phone, and sometimes going for a drive with his wife. He has no outside interests or activities. (A.R. 195)

Regarding his functional abilities, Patrick indicated he has difficulty with lifting, walking, stair climbing, squatting, bending, kneeling, standing, completing tasks, and concentrating. He stated, "I can only walk about 2 blocks. Stairs is [sic] very

hard on my knee, standing long periods of time is very painful." (A.R. 196)

Patrick indicated he follows written and spoken instructions, and gets along with authority figures, "very well." (A.R. 196-97) He handles changes in routine "ok," but does not handle stress well. (A.R. 197) He sometimes uses crutches, a cane, or a brace or splint, for ambulation. (*Id.*)

### C.  Vocational Expert's Testimony

The VE summarized Patrick's past work as follows:

> The work summary indicates truck driver, delivery of construction supplies. The dates that were in the record, 2000 to 2004. This work is under the DOT at 904.383-010; semi-skilled; SVP4[8]; medium per the DOT and heavy as performed. By testimony we have additional work as follows: processor fishing boat; DOT 522.687-046; SVP 2; unskilled; full range of medium. Forklift driver for the particle board mill; DOT at 921.38 – pardon me, 683-050; SVP 3; semiskilled, full range of medium per the DOT. Cleanup worker for the mill; that DOT is at 381.687-018; SVP 2; unskilled; full range of medium. Courier, small package delivery; the DOT is at 230.663-010; SVP is 2; this is unskilled work per the DOT and light duty. He indicated that at times he had 10 boxes a day possibly up to 30 to 40 pounds. That would be at a medium range as performed.

---

[8]In the VE's description of Patrick's past relevant work, she classifies jobs with an "SVP," or level of "specific vocational preparation" required to perform certain jobs, according to the *Dictionary of Occupational Titles*. The SVP "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Davis v. Astrue*, slip op., 2011 WL 6152870, at *9 n.7 (D. Or. Dec. 7, 2011) (Simon, J.) (citation omitted). "The DOT identifies jobs with an SVP level of 1 or 2 as unskilled, jobs with an SVP of 3 or 4 as semi-skilled, and jobs with an SVP of 5 or higher as skilled." *Whitney v. Astrue*, slip op., 2012 WL 712985, at 3 (D. Or Mar. 1, 2012) (Brown, J.) (citing SSR 00-4p).

36 - FINDINGS & RECOMMENDATION

> We have a driver for the dairy – the
> Springvalley Dairy; this . . . is under the
> DOT at 906.683-022; SVP 3; semiskilled and
> medium per the DOT. We have a driver for
> Northwest Foods; that's at 905.663-014; SVP 4;
> semiskilled and medium. . . . We have the
> Dreyer's Ice Cream. I think that was part
> time, a merchandiser. . . . Perhaps not
> relevant. . . . We have dishwasher. . . .
> DOT at 318.687-010. . .; SVP 2; unskilled work
> and medium.

(A.R. 83-84)  In addition, Patrick drove a truck for a plumbing

supply, DOT at 906.683-022.  "The SVP is 3 and it's semiskilled and

it is medium per the DOT."  (A.R. 85)

    The ALJ asked the VE the following hypothetical question:

> I'd like you to assume a person of
> [Patrick's] age, education, and work experi-
> ence who's able to perform the full range of
> light work with the following limitations:
> that this person would also need a sit and
> stand option allowing the person to alternate
> between sitting and standing positions at one-
> hour intervals throughout the day while
> remaining on task.
>
> Postural limitations at frequent are as
> follows: climb ramps or stairs, balance, and
> stoop; the remainder are at occasional.
>
> This individual will have no greater than
> occasional exposure to excessive vibration; no
> greater than occasional exposure to moving
> machinery and unprotected heights or hazardous
> machinery.
>
> Given these limitations, could such an
> individual perform any of [Patrick's] past
> work?

(A.R. 85-86)

    The VE stated the individual could perform Patrick's past work

as a courier of small packages.  (A.R. 86)  She indicated the job

would allow for the sit/stand option because couriers "come and go

and they come inside and sometimes they have quite a while to sit

and wait until something else goes so there's quite a bit of

37 – FINDINGS & RECOMMENDATION

flexibility in that." (A.R. 87)  The trips are usually local, so the time sitting would be short.  (*Id.*)  The VE indicated the courier job has "an SVP level of 2 meaning that you can learn that job in 30 days." (A.R. 93)  The math level for that job is 1, which the ALJ described as "the most basic computational skills." (*Id.*)  The VE noted the DOT does not include a sit/stand option as part of the job description for a courier.  However, the VE "rode with a courier . . . four years back," for "a six-hour shift," and in her experience, "[t]here certainly is a sit/stand option[.]" (A.R. 93-94)  She also "kind of researched the labor market [and discovered] that this was kind of customary with the couriers and there's high times of the day, there's low times of the shift, the deliveries were pretty much local, businesses/office complexes they were fairly close by." (A.R. 94)

The ALJ asked the VE to consider the same individual, but "limited to work of a simple routine and repetitive nature based upon borderline intellectual functioning no greater than reasoning level of two." (A.R. 87)  The VE indicate such an individual probably could not return to any of Patrick's past relevant work, but could perform other jobs in the national or regional economy. The VE gave the following examples:

> There's a position called a box filler, this is light packaging; the DOT is at 529.687-010; SVP is 2; this is unskilled and light duty; Oregon has 4,5000 positions; the national economy has 246,000.
>
> There's also work in what they call laboratory equipment cleaner; the DOT is at 323.687-014; the SVP is 2; this is unskilled work; Oregon has 2,100 positions at the unskilled, light level; the national economy has 206,000.

> Also there would be work in – the other
> area of work would be a large labor market[.]
> . . . [I]t's called a bench worker.  They do
> simple and unskilled work; it's well within
> the hypothetical; DOT is 713.684-018; SVP 2;
> light duty; 14,000 bench workers in the State
> of Oregon across the industries; national
> economy 347,000.

(A.R. 88)  The VE indicated all three of these jobs would allow for

the sit/stand option (*id.*), based on "[j]ob analysis, onsite

observation of the job, [and] job descriptions that have been

submitted that [the VE had] reviewed by employers[.]"  (A.R. 93=94)

The ALJ asked the VE to consider the same individual, but who

was limited to sedentary work.  The VE gave two examples of jobs

such an individual could perform:

> In the optical goods industry, they have
> sedentary positions for optical goods
> inspector; this is simple and routine
> inspection; the DOT defines this at 731.684-
> 038; SVP is 2; this is unskilled work and it
> is sedentary.
>
> And another one would be again the small
> products inspector which is 669.687-014; the
> SVP is 2; this is unskilled and sedentary;
> Oregon has 915 positions; the national economy
> 81,000.

(A.R. 88-89)  The VE indicated there are 1,400 optical goods

inspector positions in Oregon at the sedentary, unskilled level,

and 147,000 positions in the national economy.  (A.R. 89)

Patrick's attorney asked the VE to consider the second

hypothetical individual described by the ALJ – "that included the

light work, the sit/stand option, et cetera, as well as simple and

routine, . . . reasoning level number two, and in addition to that,

this person would need to elevate their leg, just one leg, twice

during the workday for approximately one half hour due to pain[.]"

39 – FINDINGS & RECOMMENDATION

1   (*Id.*)  Counsel clarified that the leg elevation would be below the

2 heart level.  (A.R. 90)  The VE stated that "[w]ith the sit/stand

3 option, while sitting folks can elevate one leg somehow under their

4 workstation."  (*Id.*)  However, she further indicated the position

5 and degree of elevation would make a difference:

6                  If it has to be up at waist level,
        usually that deters from being able to carry[]

7         on their work at a reasonable level.  So if
        they just have to prop it up, that's one

8         thing.  If they have to have it straight out
        and up, usually that slows down – it doesn't

9         necessarily totally preclude, but a half an
        hour at a time if he's actually losing work

10         activity during that time, it would impact,
        yes, very negatively.

11

12 (*Id.*)

13     Patrick's attorney asked the VE to consider the second

14 hypothetical individual again, with the added limitation of having

15 only "occasional brief coworker contact; no public contact; and

16 [the individual] would be argumentative or leave the work setting

17 if confronted with criticism by a supervisor."  (*Id.*)  The VE

18 stated the jobs she had listed "only require occasional interface

19 with other workers, occasional meaning up to one-third of the

20 day. . . .  [T]he rest of the time is kind of concentrated on what

21 they do quite independently.  However, there's no public contact on

22 these jobs."  (*Id.*)  Regarding the argumentativeness, the VE stated

23 "there's a low tolerance for such behavior in the workplace and one

24 issue could result in a request to leave or warning if it would

25 happen again.  [The individual] certainly wouldn't be able to

26 sustain employment with that behavior in the workplace." (A.R. 91)

27 / / /

28 / / /

40 - FINDINGS & RECOMMENDATION

### III.  DISABILITY DETERMINATION AND THE BURDEN OF PROOF

#### A.  Legal Standards

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act."  *Keyser v. Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520).  The Keyser court described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments described in the regulations?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and 416.920 (b)-(f)).  The claimant bears the burden of proof for the first four steps in the process.  If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled.  *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general standards for evaluating disability), 404.1566 and 416.966

41 - FINDINGS & RECOMMENDATION

(describing "work which exists in the national economy"), and 416.960(c) (discussing how a claimant's vocational background figures into the disability determination).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails meet this burden, then the claimant is disabled, but if the Commissioner proves the claimant is able to perform other work which exists in the national economy, then the claimant is not disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R. §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

The ALJ also determines the credibility of the claimant's testimony regarding his or her symptoms:

> In deciding whether to admit a claimant's subjective symptom testimony, the ALJ must engage in a two-step analysis. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). Under the first step prescribed by *Smolen*, . . . the claimant must produce objective medical evidence of underlying "impairment," and must show that the impairment, or a combination of impairments, "could reasonably be expected to produce pain or other symptoms." *Id.* at 1281-82. If this . . . test is satisfied, and if the ALJ's credibility analysis of the claimant's testimony shows no malingering, then the ALJ may reject the claimant's testimony about severity of symptoms [only] with "specific findings stating clear and convincing reasons for doing so." *Id.* at 1284.

*Batson v. Commissioner*, 359 F.3d 1190, 1196 (9th Cir. 2004).

/ / /

/ / /

1

### B.   The ALJ's Decision

2     The ALJ found Patrick has not engaged in substantial gainful
3  activity since his alleged disability onset date of May 23, 2008.
4  He found Patrick has severe impairments consisting of "status post
5  multiple arthroscopic surgeries of the left knee; depression; and
6  borderline  intellectual  functioning,"  but  further  found  these
7  impairments,  singly  or  in  combination,  do  not  meet  or  medically
8  equal the Listing level of severity.  (A.R. 28-31)  The ALJ also
9  noted Patrick "has been observed to be obese," and thus, he "can
10 reasonably  be  expected  to  experience  limitations  related  to
11 obesity, such as the stress of excess weight on the musculoskeletal
12 system  and  internal  organs  causing  pain  and  reduced  range  of
13 motion, resulting in greater than minimal effects on the capacity
14 to do work related activities."  (A.R. 29)

15    The ALJ noted Patrick did not mention pain in his right knee
16 at the hearing, and Patrick's "treating surgeon, Robb Larsen, M.D.,
17 could  offer  nothing  beyond  weight  loss  and  use  of  anti-
18 inflammatories" for Patrick's right knee.  (*Id.*)  The ALJ therefore
19 found  Patrick's  "right  knee  impairment  is  non-medically
20 determinable."  (*Id.*)   The  ALJ  further  noted  Dr.  Higgins-Lee
21 diagnosed Patrick with PTSD, but Patrick "has not reported the
22 related symptoms to other sources and has not sought treatment."
23 (*Id.*)  The ALJ therefore concluded Patrick's "symptoms were not
24 significantly  limiting  and  possttraumatic  stress  disorder  is
25 therefore nonsevere."  (*Id.*)

26    Regarding Patrick's allegation that he suffers from bipolar
27 disorder, the ALJ found as follows:

28

43 - FINDINGS & RECOMMENDATION

> At hearing and in report to several medical sources, [Patrick] alleged having bipolar disorder. Also at hearing and to primary care provider Steven Yoder, M.D., [Patrick] claimed to have been diagnosed with bipolar disorder by Dr. Higgins-Lee. Review of her report shows this to be a complete fabrication by [Patrick]. Any other mention of bipolar disorder within the record is a result of [Patrick's] misrepresentation. Therefore, his alleged bipolar disorder is not a medically determinable impairment.

(*Id.*)

The ALJ found Patrick has the residual functional capacity ("RFC") to perform light work with the following limitations:

> [H]e requires the ability to alternate between sitting and standing at one hour intervals while on task. He can frequently climb ramps and stairs, balance and stoop and only occasionally kneel, crouch, crawl and climb ladders, ropes and scaffolds. [He] is to have no more than occasional exposure to excessive vibration, hazardous machinery or heights. He is limited [to] work no greater than a reasoning level of two.

(A.R. 31)

The ALJ found that although Patrick's medically-determinable impairments reasonably could be expected to cause the symptoms he alleges, Patrick's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC]." (A.R. 32) The ALJ cited several reasons for finding Patrick's testimony less than full credible:

1) Patrick's function report of December 2008, was completed within two months of his arthroscopic knee surgery. At that time, Patrick cared for his dog; cared for his personal care needs and took his medications without reminders; was able to cook, clean, do

44 - FINDINGS & RECOMMENDATION

1  laundry and dishes, go grocery shopping, and handle finances; and
2  could walk for two blocks at a time. (*Id.*)

3      2)   The   ALJ   found   "multiple   inconsistencies   between
4  [Patrick's] characterization of his impairments and treatment and
5  the evidence contained in treating and examining source records."
6  (*Id.*)

7          (a) The ALJ again noted Patrick testified Dr. Higgins-Lee
8  "diagnosed him with bipolar disorder but the report only indicates
9  'his mother had told him he has a bipolar disorder[.]'" (*Id.*)  All
10  other references in the record to bipolar disorder were based on
11  Patrick's "erroneous self-report." (*Id.*)

12          (b) The ALJ found Patrick's testimony that he has used
13  Vicodin daily since his September 2009 surgery to be inconsistent
14  with records from Patrick's treating sources.   P.A. Brandon
15  prescribed "'a few' Vicodin . . . in August of 2009[.]" (*Id.*)
16  Dr. Yoder noted he did not have Patrick's prior medical records
17  yet, and he prescribed Vicodin in May 2010, based on Patrick's
18  "self-report that he had been using the drug." (*Id.*)  Dr. Yoder
19  further indicated, in June 2010, that Patrick had stated "Vicodin
20  made him nauseated, so this was stopped.'" (*Id.*)  On a list of
21  medications Patrick was taking in March 2010, Patrick did not list
22  any pain medications. (*Id.*)  And Dr. Larsen stated "[s]everal
23  times" that Patrick was "'not taking any pain medication.'" (*Id.*)
24  The ALJ noted:

>           Asked about the apparent inconsistencies at
>           hearing, [Patrick] asserted that Dr. Larsen
>           was wrong, he had been taking the medication,
>           that Dr. Yoder's notation was wrong as well
>           and he did not know why Dr. Yoder would say
>           that and that he did not know why the form,
>           which he completed, did not list pain

45 - FINDINGS & RECOMMENDATION

> medications.  It is difficult to believe that
> two treating sources and the claimant himself
> would all make similar mistakes concerning
> prescription and use of a control[led] sub-
> stance.  This weighs heavily against the
> claimant's credibility.

(A.R. 32-33)

3)  Patrick told Dr. Higgins-Lee that he had lost his job delivering milk because he was "'afraid to be out in the dark by himself,'" but when the ALJ asked about this at the hearing, Patrick stated "he was laid off, yet another inconsistent statement eroding credibility."  (A.R. 34)

4)  When Patrick saw Dr. Higgins-Lee in August 2009, he stated he consumed "a 'couple of beers about every night.'  At hearing[, he] testified that this was what he drank in the past and [he] had not been using alcohol for many years."  (*Id.*)

5)  Patrick, himself, testified he likely would be able to work if he had a sit/stand option, and "he has looked for work since 2008."  (A.R. 32)

The ALJ noted Dr. Yoder had opined Patrick would be able to stand/walk less than two hours and sit about six hours during a workday, but the doctor also indicated Patrick "may need to sit periodically."  The ALJ found these statements to be inconsistent. (A.R. 34-35)  The ALJ also noted Dr. Yoder had only seen Patrick twice, and did not have Patrick's prior medical records, at the time Dr. Yoder completed his assessment.  The ALJ further found, "As a family practice physician Dr. Yoder does not have a specialization that further qualifies assessment of [Patrick's] impairments and his opinion is not supported by either his treatment notes or the other evidence of record."  (A.R. 35)  For

46 - FINDINGS & RECOMMENDATION

these reasons, the ALJ did not give Dr. Yoder's opinion great weight. (*Id.*)

The ALJ gave great weight to Dr. Westfall's opinion based on her review of Patrick's records in February 2009, noting her assessment was affirmed on reconsideration in April 2009. The ALJ indicated his RFC assessment was "supported by [Patrick's] own admitted functionality, the lack of credibility concerning his alleged limitations, the state agency medical consultant opinions and Dr. Higgins-Lee['s] assessment." (*Id.*)

The ALJ concluded that Patrick is able to perform his past relevant work as a small package courier, a job which "does not require the performance of work-related activities precluded by [Patrick's] residual functional capacity." (*Id.; see* A.R. 35-37) The ALJ further found that in the event the courier occupation does not qualify as past relevant work, Patrick could perform other work existing in significant numbers in the national economy, including box filler, laboratory equipment cleaner, and bench worker. (A.R. 37)  The ALJ therefore concluded Patrick has not been under a disability from May 23, 2008, through July 28, 2010. (A.R. 37-38)

## *IV.  STANDARD OF REVIEW*

The court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black v. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1 (9th Cir. May 20, 2011).  Substantial evidence is '"more than a

47 - FINDINGS & RECOMMENDATION

**mere** scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)). Instead, the court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions. *Id.* However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the court may not substitute its judgment for the ALJ's. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## V.  DISCUSSION

### A.  Weight Given to Doctors' Opinions

Patrick argues the ALJ erred in failing to give Dr. Yoder's opinion great weight as a matter of law. He argues it was improper for the ALJ to reject Dr. Yoder's opinion on the basis that Dr. Yoder is a family practitioner, noting the Record does not contain a contradictory opinion from a specialist. Patrick further argues that, contrary to the ALJ's finding, Dr. Yoder's objective findings do support his opinion. He notes Dr. Yoder "found that Patrick had tenderness along the medial joint line and crepitance." Dkt. #14, p. 14. Although Patrick acknowledges he "was mistaken about the bipolar disorder," he maintains he was correct in his

48 - FINDINGS & RECOMMENDATION

statement that his surgery was for torn cartilage, "as his surgeon debrided fragmented and fibrillated cartilage in the surgery in October of 2008[, and] [i]n the same surgery, a complex meniscus tear was resected." *Id.*, pp. 13-14.    Patrick asserts the ALJ failed to give clear and convincing reasons for rejecting Dr. Yoder's opinion.

Patrick makes a similar argument regarding the weight given to Dr. Higgins-Lee's consultative opinion.    Patrick notes that Dr. Higgins-Lee indicated he likely would have problems with attention to detail, and therefore "he would be limited to simple, routine work." *Id.*, p. 14.    She also indicated Patrick likely would have problems with coworkers, and especially supervisors, and she "also diagnosed depression and PSTD [sic] in light of [Patrick's] flashbacks to childhood abuse." *Id.*    Patrick argues the ALJ did not include the limitations identified by Dr. Higgins-Lee in his RFC assessment, nor did the ALJ give clear and convincing reasons for rejecting Dr. Higgins-Lee's opinions. *Id.*, pp. 14-15.

The law regarding the weight to be given to the opinions of treating physicians is well established.    "The opinions of treating physicians are given greater weight than those of examining but non-treating physicians or physicians who only review the record." *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1036 (9th Cir. 2003).    The ALJ determines the credibility of medical testimony and also resolves any conflicts in the evidence. *Carmickle v. Commissioner*, 533 F.3d 1155, 1164 (9th Cir. 2008); *Batson v. Commissioner*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).    The ALJ may

49 - FINDINGS & RECOMMENDATION

1  disregard treating physicians' opinions where they are "conclusory,
2  brief, and unsupported by the record as a whole, . . . or by
3  objective medical findings." *Id.* (citing *Matney, supra; Tonapetyan
4  v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)).   In addition, an
5  ALJ may reject doctors' opinions given on "check-off reports that
6  [do] not contain any explanation of the bases of their conclu-
7  sions." *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (citing
8  *Murray v. Heckler*, 722 F.3d 299, 501 (9th Cir. 1983)).   In any
9  event, an ALJ must give specific, clear, and convincing reasons for
10  rejecting a treating doctor's opinions and ultimate conclusions.
11  *Batson*, 359 F.3d at 1196 (quoting *Matney*); *Benton*, 331 F.3d at 1036
12  (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

13      Dr. Yoder indicated Patrick would not need to lie down or rest
14  periodically, but "he may need to sit periodically." (A.R. 430)
15  He indicated side effects from Patrick's medications "should not
16  limit his activities." (*Id.*)   He stated Patrick would need to
17  elevate his legs "only if it helps decrease pain." (*Id.*)   The
18  doctor nevertheless indicated Patrick would be limited to standing
19  and walking for less than two hours during the workday, and sitting
20  for six hours of the workday. (A.R. 430-31)

21      The ALJ gave the following reasons for rejecting Dr. Yoder's
22  opinion regarding Patrick's functional abilities:

23      1)   Dr. Yoder began treating Patrick in May 2010, and "had
24  only two office visits on which to base his assessment." (A.R. 35)

25      2)   "It appears that Dr. Yoder did not have the benefit of
26  review of prior treating sources['] records[,] and information pro-
27  vided by [Patrick] - that his right knee had torn cartilage, that
28  he had been diagnosed with bipolar disorder and that he had been

50 - FINDINGS & RECOMMENDATION

prescribed Vicodin - was erroneous at best but perhaps advanced for secondary gain." (*Id.*)

3)    "As a family practice physician Dr. Yoder does not have a specialization that further qualifies his assessment of [Patrick's] impairments[.]" (*Id.*)

4)    Dr. Yoder's "opinion is not supported by either his treatment notes or the other evidence of record." (*Id.*)

5)    Dr. Yoder's "assessment is internally inconsistent in stating that [Patrick] may need to sit periodically but that he could stand and walk for less than two hours of an eight hour workday." (*Id.*)

Even where a treating source's medical opinions are not controlling, they still are "'entitled to deference and must be weighed' using factors listed in the regulations." *Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001) (citing SSR 96-2p; 20 C.F.R. § 404.1527; 20 C.F.R. § 416.927). "The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; [and] (6) specialization." *Edlund*, 253 F.3d at 1157 n.6 (citing 20 C.F.R. § 404.1527). Here, the ALJ considered the fact that Dr. Yoder had only begun treating Patrick a month before completing the evaluation form, and had only seen Patrick twice. The doctor did not yet have the records from Patrick's previous treating sources for review. Dr. Yoder's opinions were internally inconsistent, stating, on the one hand, that Patrick might need to sit periodically, and on the other hand, that he could only stand or walk for two hours a day. And Dr. Yoder is a family practitioner,

51 - FINDINGS & RECOMMENDATION

1   not an orthopedic specialist. All of these are factors the
2   regulations specify as relevant to an ALJ's evaluation of a
3   treating source's opinions.

4       The court finds the ALJ provided clear, convincing, legitimate
5   reasons for rejecting Dr. Yoder's opinion regarding the amount of
6   time Patrick could spend standing, walking, and sitting during the
7   day.   Further, the court rejects Patrick's argument that those
8   limitations are supported by Dr. Yoder's objective findings on
9   examination.   The finding that "Patrick had tenderness along the
10  medial joint line" is actually subjective, rather than objective,
11  as the finding is based on Patrick's self-report that he
12  experienced tenderness in that area.   Even if true, the mere
13  presence of tenderness and crepitus does not support a two-hour
14  standing/walking limitation.

15      Turning to Dr. Higgins-Lee's opinions, Patrick complains that
16  the ALJ failed to consider this consulting psychologist's opinions
17  that Patrick would have problems with attention to detail, and
18  therefore should be limited to simple, routine work; his processing
19  speed and working memory are below average; he likely would have
20  problems with coworkers and especially supervisors; his intelli-
21  gence is "very close to mild mental retardation"; and he suffers
22  from PTSD. Dkt. #14, p. 14.   The ALJ's opinion shows, however,
23  that he did consider these factors and Dr. Higgins-Lee's other
24  opinions.

25      The ALJ noted that although Patrick "tested in the borderline
26  range of intellectual functioning, [his] work history includes
27  performance of several semiskilled positions for periods of up to
28  several years[.]"   (A.R. 34)   The ALJ gave Patrick "the benefit of

1  the doubt," and also "factor[ed] in the additional impact of
2  depression," in limiting him to work with an SVP level no greater
3  than two. (*Id.*)  The ALJ also noted Patrick filled out the intake
4  forms for Dr. Higgins-Lee without assistance. (*Id.*)  In addition,
5  as discussed above in section IV.B., the ALJ noted two areas of
6  inconsistency between Patrick's self-report to the doctor and his
7  hearing testimony.  The ALJ found that some of the doctor's
8  opinions were based on situational factors or Patrick's self-
9  report, rather than objective factors.  Regarding the diagnosis of
10 PTSD, the ALJ found Patrick had "not reported the related symptoms
11 to other sources and has not sought treatment." (A.R. 29)  The ALJ
12 therefore concluded that PTSD was not a severe impairment. (*Id.*)

13     In posing hypothetical questions to the VE, the ALJ speci-
14 fically asked the VE to consider someone of Patrick's age and with
15 his past work experience who would be "limited to work of a simple
16 routine and repetitive nature based upon borderline intellectual
17 functioning no greater than reasoning level of two." (A.R. 87)
18 This question included Dr. Higgins-Lee's finding that Patrick
19 should be limited to simple, routine work.  The VE indicated such
20 an individual would be able to perform jobs such as box filler,
21 laboratory equipment cleaner, and bench worker, all of which would
22 allow for a sit/stand option, and are unskilled jobs with a
23 reasoning level of 2. (A.R. 88)  Further, Patrick testified that
24 he could do a job with a sit/stand option.

25     The court finds the ALJ provided clear and convincing reasons
26 for the weight he gave to Dr. Higgins-Lee's opinions.
27 / / /
28 / / /

53 - FINDINGS & RECOMMENDATION

### B.  Finding that Patrick Can Work

Patrick also argues the ALJ erred in finding he is able to perform his past relevant work as a small package courier.  Patrick notes the ALJ included, in one of his hypothetical questions to the VE, a limitation of simple, routine work, which represents Patrick's borderline intellectual functioning, but then the ALJ failed to include that limitation in his RFC assessment. He argues the VE acknowledged that the current requirements of a small package courier probably exceed the limitations of simple, routine work.  "The Commissioner does not dispute that the vocational expert hesitated to name the courier job as one that [Patrick] could perform." Dkt. #16, p. 13.  However, the Commissioner notes the VE identified other jobs Patrick could perform that require only simple, routine, repetitive work with a reasoning level of two or less.

All three of the jobs identified by the VE are unskilled work with an SVP of 2.  Thus, even if the ALJ's finding that Patrick could return to his past work as a small package courier was error, that error was harmless, as the ALJ also found, in the alternative, that Patrick can perform other work that exists in significant numbers in the national economy.  *See Carmickle v. Commissioner*, 533 F.3d 1155, 1162 (9th Cir. 2008) (ALJ's error may be harmless if it is "'inconsequential to the ultimate nondisability determina-tion.'") (quoting *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006)).

Patrick further argues "the RFC and hypothetical did not include the ALJ's own findings that [Patrick] has 'moderate' limitations in social functioning and in concentration, persis-

54 – FINDINGS & RECOMMENDATION

ten[ce] or pace." Dkt. #14, p. 16.  Patrick asserts a hypothetical question that includes a imitation to "unskilled" work "does not incorporate limitations in concentration, persistence and pace." *Id.* (citing *Winschel v. CSSA*, 631 F.3d 1176, 1179 (11th Cir. 2011); *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004); *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009)).

The Commissioner responds that "Social Security Ruling 96-8p cautions the adjudicator to 'remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment, but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.'" Dkt. #16, p. 14 (quoting SSR 96-8p, 1996 WL 374184, at *4).

The cases cited by Patrick are from the Eleventh, Third, and Seventh Circuits.  The Ninth Circuit, in contrast, agrees with the Eighth and Sixth Circuits, in holding that a hypothetical question describing an ability to do "simple, routine, repetitive work" may be adequate if other substantial evidence indicates that despite those deficiencies, a claimant nevertheless retains the ability to perform simple, repetitive, routine tasks. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008) (citing *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001)).

Here, in finding Patrick has "moderate difficulties" with regard to concentration, persistence, or pace, the ALJ expressly relied on Dr. Higgins-Lee's assessment that Patrick's "severe mental impairments would cause some interference" in these areas. (A.R. 30)  An ALJ's RFC assessment "adequately captures restrictions related to concentration, persistence, or pace where the

55 - FINDINGS & RECOMMENDATION

assessment is consistent with restrictions identified in the medical testimony." *Stubbs-Danielson*, 539 F.3d at 1174 (citing *Howard, supra*; *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)). However, other substantial evidence in the Record – indeed, Patrick's employment history itself – establishes that despite these moderate difficulties, Patrick retains the ability to perform simple, routine, repetitive tasks; i.e., unskilled work. The ALJ's RFC assessment that limits Patrick to work requiring no more than a reasoning level of two encompasses such a limitation. *See Terry v. Sullivan*, 903 F.2d 1273, 1276-77 (9th Cir. 1990) (noting an SVP of 2 "corresponds precisely to the definition of unskilled work embodied in SSA regulations"; citing 20 C.F.R. § 404.15689a)). As noted above, the three jobs identified by the VE as ones Patrick could perform are all unskilled jobs with an SVP level of 2.

The court finds the ALJ did not err in failing to specifically include "moderate limitations in concentration, persistence, or pace" in his RFC assessment, or in a hypothetical question to the VE.

Patrick also argues the ALJ erred in failing to include in a hypothetical question Dr. Higgins-Lee's finding that Patrick likely would have difficulties with supervisors. The court finds this was not error. Dr. Higgins-Lee's finding in that regard was based solely on Patrick's self-report: "Since [Patrick} reported a history of many altercations, he could be expected to have difficulties with co-workers and especially supervisors." (A.R. 296) Patrick did not testify about fights or altercations with coworkers or supervisors. Rather, he stated that when things were

56 - FINDINGS & RECOMMENDATION

not going well at work, he simply walked off the job.  Because the record does not contain even minimal evidence to support this finding, the ALJ did not err in failing to include it in a hypothetical question to the VE.

### VI.  CONCLUSION

Simply stated, the ALJ did not err in finding, based on substantial evidence in the Record, that Patrick is not disabled. Therefore, the Commissioner's decision should be affirmed.

### VII.  SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.  Objections, if any, are due by **March 18, 2013**. If no objections are filed, then the Findings and Recommendations will go under advisement on that date.  If objections are filed, then any response is due by **April 4, 2013**.  By the earlier of the response due date or the date a response is filed, the Findings and Recommendations will go under advisement.

IT IS SO ORDERED.

Dated this  1st  day of March, 2013.


 /s/ Dennis James Hubel
Dennis James Hubel
Unites States Magistrate Judge


57 – FINDINGS & RECOMMENDATION